Filed 2/27/24  P. v. Ramos CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>LUIS RAMOS,<br><br>    Defendant and Appellant. | B324174<br><br>Los Angeles County<br>Super. Ct. No. BA442346 |

APPEAL from an order of the Superior Court of Los Angeles County, Eleanor J. Hunter, Judge. Reversed and remanded.

John Lanahan, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Kenneth C. Byrne and Allison H. Chung, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

In 2019, a jury found defendant and appellant Luis Ramos guilty of first degree murder and four counts of attempted murder. In 2022, Ramos filed a petition for resentencing under Penal Code section 1172.6.[1] The trial court denied the petition on the grounds that Ramos's trial took place after changes in the law concerning murder and that any arguments Ramos had with respect to resentencing could be addressed in his direct appeal. Ramos contends that the court erred in its reasoning and in denying his petition without appointing counsel. The Attorney General agrees that the court erred in denying the petition without appointing counsel but contends that any error was harmless because Ramos was not entitled to relief under section 1172.6 as a matter of law.

We agree that the court erred, both in failing to comply with the procedures set forth in section 1172.6 and in its conclusion that Ramos's arguments regarding resentencing would be, or could have been, addressed on a direct appeal from his convictions. Because there is no basis in the record to conclude that the court considered the record of conviction or made any determination as whether Ramos's petition made a prima facie showing of entitlement to relief, we reverse and remand.

---

[1] All undesignated statutory references are to the Penal Code. Ramos filed his petition for resentencing under former section 1170.95, which the Legislature later renumbered to section 1172.6 without substantive change. (Stats. 2022, ch. 58, § 10.) We hereafter cite to section 1172.6 for ease of reference.

## FACTUAL BACKGROUND[2]

Ramos and his codefendant, Josue Garcia, were members of the MS-13 street gang and acted in retaliation against Edwin Jurado, whom they believed to be a member of the rival 18th Street gang, after an altercation between Jurado and a member of MS-13 at a nightclub, El Cafetal. Pablo Delgado, Jr. was driving Jose Delgado, Pablo Delgado, Sr., and Christian Diaz home after a Dodgers game when they observed Jurado, whom they did not know, being attacked by a group of men. They stopped to render assistance to Jurado and Garcia shot at their car, striking Diaz. During the altercation with the MS-13 members, Jurado sustained three gunshot wounds, two of which were fatal.

Ramos's former girlfriend, Dina Padilla, testified at trial that she, Ramos, and another MS-13 member, Carlos Gonzalez, were turned away from El Cafetal and returned to an apartment where other gang members were angry about an incident that had taken place at the nightclub. They wanted to go back to El Cafetal and teach someone who had disrespected them a lesson. Ramos eventually agreed to go with them and took a revolver with him. He told Padilla to stay behind at the apartment with Maria Escobar, but Escobar convinced Padilla to drive her to the nightclub. When they arrived near the nightclub, Escobar saw Jurado, exited the car, and punched Jurado in the face, knocking

_____

[2] In his petition below, Ramos did not describe the facts underlying his convictions. On appeal, Ramos includes a detailed factual background based on the record in his direct appeal, which we briefly summarize here for the limited purpose of providing context. We do not use it to determine if Ramos made a prima facie showing.

3

him to the ground. Padilla observed Ramos, Garcia, and other MS-13 members approach and join Escobar in attacking Jurado. They began hitting and kicking Jurado while he was on the ground. A strange car pulled up and Padilla heard gunshots. She saw Ramos holding a revolver at the time the shots were fired. Escobar re-entered the car as Padilla was turning it around to return to the apartment. She appeared nervous and stated that they had killed someone.

Carlos Gonzalez also testified. On the night of the shootings, Gonzalez planned to go to El Cafetal with Ramos and Padilla. However, while they were making their way there, Ramos received a phone call and they went back to the apartment to get guns. Gonzalez testified that Ramos was the one running the clique at the time and that he was the one who would decide who would commit the crime. Ramos, Garcia, and Gonzalez drove back to El Cafetal and, after they saw Escobar begin to fight with Jurado, Ramos approached with Garcia. As Jurado was beginning to stand, Ramos grabbed him by the head and shot him. He fired additional shots at Jurado, although Garcia did not know how many. While all this was taking place, a car pulled up, and Gonzalez observed Garcia fire approximately three shots at the car.

Transcripts of two wiretap conversations between Ramos and another MS-13 member were also introduced at trial. The first conversation appeared to concern police fliers with three men pictured in buses that passed through the Rampart area, where the shootings took place. Ramos stated that the fliers had been in the buses for about a year and that he " 'was pulling [his] hair out . . . because [he] did not know anything about that.' " Ramos also expressed concern about fingerprints. In the second

conversation, Ramos mentioned turning himself in. He and the other MS-13 member discussed how the police had come around the area posting pictures and seeking information. The two discussed an unnamed " 'girl' " they believed was talking to the police and Ramos suggested that someone should "pick her up" so that if they were eventually named as "the shooters, there won't be any witnesses." He later stated that he did not believe that "those assholes" had anything on him and that they just had to lay low for a while.

## PROCEDURAL BACKGROUND

In an information filed December 19, 2016, Ramos and Garcia were charged with one count of murder (§ 187, subd. (a)), four counts of willful, deliberate, and premeditated attempted murder (§ 664/187, subd. (a)), and one count of shooting at an occupied motor vehicle (§ 246).[3] In connection with each of these counts, it was further alleged that a principal personally and intentionally discharged a firearm, which proximately caused the death of Edwin Jurado, within the meaning of sections 12022.53, subdivisions (d) and (e)(1); that a principal personally and intentionally discharged a firearm within the meaning of section 12022.53, subdivisions (c) and (e)(1); and that a principal personally used a firearm within the meaning of section 12022.53, subdivisions (b) and (e). Finally, it was alleged pursuant to section 186.22, subdivision (b)(1)(C) that the offenses were committed for the benefit of, at the direction or, or in association with a criminal street gang with the specific intent to

---

[3] Garcia was also charged with one count of criminal threats in connection with an unrelated incident (§ 422, subd. (a)).

promote, further, or assist in criminal conduct by gang members, and that the offense of shooting at an occupied vehicle was committed for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further, or assist in criminal conduct by gang members pursuant to section 186.22, subdivision (b)(4).

An amended information dated August 19, 2019, charged the defendants with the same offenses, but clarified the names of the attempted murder victims. With respect to the murder charge, it additionally alleged that Ramos personally and intentionally discharged a firearm which resulted in the victim's death (§ 12022.53, subd. (d)), personally and intentionally discharged a firearm (*id*., subd. (c)), and personally used a firearm (*id*., subd. (b)).

In September 2019, a jury found Ramos guilty of first degree murder and the four counts of attempted murder. With respect to the murder charge, the jury found true the allegations that Ramos personally and intentionally discharged a firearm, which caused death to the victim; personally and intentionally discharged a firearm; and personally used a firearm. With respect to all counts against Ramos, the jury also found that a principal personally and intentionally discharged a firearm, which caused death to the victim; that a principal personally and intentionally discharged a firearm; and that a principal personally used a firearm. The jury also found the gang allegations to be true.

The court sentenced Ramos to 50 years to life for the murder and 160 years to life for the attempted murders. The court also imposed and stayed a sentence of 32 years to life for shooting at an occupied motor vehicle.

Ramos appealed and a panel of this Division affirmed the judgment in an unpublished opinion, *People v. Ramos* (May 14, 2021, B304855).

In April 2022, Ramos filed a handwritten petition for resentencing under former section 1170.95. Ramos alleged that an information was filed against him: (1) that allowed the prosecution to proceed under a theory of felony murder, murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on his participation in a crime, or attempted murder under the natural and probable consequences doctrine; (2) he was convicted of murder and attempted murder following a trial; and (3) he could not presently be convicted of murder or attempted murder because of changes made to sections 188 and 189. Ramos asserted that CALCRIM Nos. 1402 and 3149 allowed the jury to convict him of murder under the theory of liability of the natural and probable consequences doctrine. With respect to attempted murder, Ramos asserted that CALCRIM Nos. 600, 601, and 1402 demonstrated the prosecution's reliance on the natural and probable consequences doctrine. He subsequently filed a form petition as well.

In June 2022, a judge other than the sentencing judge issued an order denying the petition without appointing counsel for Ramos, accepting further briefing, or holding a hearing. The trial court stated that section 1172.6 became effective January 19, 2019, that Ramos was therefore "convicted under the new law regarding murder," and that "[a]ny issue regarding his conviction would be addressed on his direct appeal."

# DISCUSSION

Ramos contends that the court erred in denying his petition without appointing him counsel because the petition was facially sufficient. He further contends that the court erred in its conclusion that he could raise any issue regarding his conviction on direct appeal, both because the law regarding attempted murder did not change until after his direct appeal was decided and because claims made under section 1172.6 must be raised in a post-conviction petition filed in the superior court. Ramos argues, "had the trial [court] not summarily denied [his] petition and appointed counsel, the obvious error of the trial court dismissing the petition on the basis that the claim of resentencing could be raised on direct appeal could have raised before the trial court." He also asserts that "the issues at trial were different from those at Mr. Ramos's trial from those raised in the petittion [*sic*] to recall his sentence."

The Attorney General does not dispute that the petition was facially sufficient or that the court erred in summarily denying the petition without appointing counsel for Ramos and does not dispute Ramos's further contention that the court's basis for denying the petition was incorrect. Rather, the Attorney General argues that we should affirm because Ramos "cannot show a reasonable probability of a more favorable outcome had he had the benefit of counsel."

We reverse and remand for the court to appoint counsel for Ramos, accept further briefing, and hold a prima facie hearing.

## 1. Legal Standards

As amended by Senate Bill No. 775 (Stats. 2021, ch. 551, § 2), effective January 1, 2022, section 1172.6, subdivision (a)

provides: "A person convicted of felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, attempted murder under the natural and probable consequences doctrine, or manslaughter may file a petition with the court that sentenced the petitioner to have the petitioner's murder, attempted murder, or manslaughter conviction vacated and to be resentenced on any remaining counts[.]"

An offender must file a petition in the sentencing court averring that: "(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder, murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, or attempted murder under the natural and probable consequences doctrine[;] [¶] (2) The petitioner was convicted of murder, attempted murder, or manslaughter following a trial or accepted a plea offer in lieu of a trial at which the petitioner could have been convicted of murder or attempted murder[;] [¶] [and] (3) The petitioner could not presently be convicted of murder or attempted murder because of changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (a)(1)–(3); see also *id.*, subd. (b)(1)(A).) Additionally, the petition shall state "[w]hether the petitioner requests the appointment of counsel." (*Id.*, subd. (b)(1)(C).)

"Upon receiving a petition in which the information required by this subdivision is set forth or a petition where any missing information can readily be ascertained by the court, if the petitioner has requested counsel, the court shall appoint

9

counsel to represent the petitioner." (§ 1172.6, subd. (b)(3).) The prosecutor shall file a response within 60 days of the service of the petition, and the petitioner may file a reply within 30 days of the response. (*Id*., subd. (c).) When briefing has been completed, "the court shall hold a hearing to determine whether the petitioner has made a prima facie case for relief." (*Ibid*.) "If the petitioner makes a prima facie showing that the petitioner is entitled to relief, the court shall issue an order to show cause." (*Ibid*.)

In determining whether a petitioner has made a prima facie showing of entitlement to relief, the trial court's inquiry will necessarily be informed by the record of conviction, which will facilitate the court in distinguishing "petitions with potential merit from those that are clearly meritless." (*People v. Lewis* (2021) 11 Cal.5th 952, 971 (*Lewis*).) This includes the jury instructions, which are part of the record of conviction, because the instructions "given at a petitioner's trial may provide 'readily ascertainable facts from the record' that refute the petitioner's showing, and reliance on them to make the eligibility or entitlement determinations may not amount to 'factfinding involving the weighing of evidence or the exercise of discretion,' " which must wait to occur until after an order to show cause issues. (*People v. Soto* (2020) 51 Cal.App.5th 1043, 1055, disapproved on another ground in *Lewis*.) The court is prohibited from engaging in " 'factfinding involving the weighing of the evidence or the exercise of discretion.' " (*Lewis*, at p. 972.) Rather, the court must " ' "take[ ] [the] petitioner's factual allegations as true" ' " and make a " ' "preliminary assessment regarding whether the petitioner would be entitled to relief if his or her factual allegations were proved." ' " (*Id*. at p. 971.) Summary

10

denial of the petition is appropriate where the record of conviction establishes the petitioner is ineligible for resentencing as a matter of law. (*People v. Estrada* (2022) 77 Cal.App.5th 941, 945.)

"The mere filing of a section [1172.6] petition does not afford the petitioner a new opportunity to raise claims of trial error or attack the sufficiency of the evidence supporting the jury's findings. To the contrary, '[n]othing in the language of section [1172.6] suggests it was intended to provide redress for allegedly erroneous prior factfinding . . . . The purpose of section [1172.6] is to give defendants the benefit of amended sections 188 and 189 with respect to issues not previously determined, not to provide a do-over on factual disputes that have already been resolved.' [Citation.]" (*People v. Farfan* (2021) 71 Cal.App.5th 942, 947.)

## 2. The court erred in denying the petition without appointing counsel.

In *Lewis*, our Supreme Court held that once a petitioner files a facially sufficient petition under section 1172.6 and requests appointment of counsel, the superior court must appoint counsel before conducting any prima facie review. (*Lewis*, *supra*, 11 Cal.5th at p. 963 ["petitioners who file a complying petition requesting counsel are to receive counsel upon the filing of a compliant petition"]; accord, § 1172.6, subd. (b)(3).) There is no dispute that Ramos's handwritten petition and his form petition were facially sufficient. We agree with the parties that the court erred in denying Ramos's petition without appointing counsel, permitting further briefing, and holding a prima facie hearing.

We conclude that the court further erred in rejecting Ramos's petition on the ground that his contentions could be

addressed on direct appeal. At the time Ramos filed his petition, his direct appeal had already been resolved. Moreover, the Supreme Court had previously rejected the contention that an appellant could seek relief under section 1172.6 on a direct appeal. (See *People v. Gentile* (2020) 10 Cal.5th 830, 851–852 ["[C]onvictions may be challenged on Senate Bill 1437[4] grounds only through a petition filed in the sentencing court under [former] section 1170.95."].) Although the Legislature abrogated this holding the following year by expressly authorizing challenges on direct appeal (§ 1172.6, subd. (g)), that change in the law did not take effect until January 2022, approximately eight months after Ramos's appeal was decided.[5]

---

[4] "Senate Bill 1437 amended the natural and probable consequences doctrine for murder and the felony-murder rule 'to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life[]' [citation] . . . [and] provided for retroactive application of these amendments by creating a process in [former] section 1170.95 through which qualifying defendants can have their murder convictions vacated and be resentenced." (*People v. Cruz* (2020) 46 Cal.App.5th 740, 746.)

[5] Ramos notes that the judge who denied his petition was not the same judge who sentenced him but does not assert this as an independent ground for error. In *People v. Santos* (2020) 53 Cal.App.5th 467, 474, Division Five of this District held section 1172.6, subdivision (b), requires "the individual public official" who sentenced the petitioner to rule on the petition unless the record shows the presiding justice of the superior court determined that person was "not available" to do so. There is no evidence in the record that the sentencing judge was not available to rule on Ramos's petition, and thus this is another basis to conclude the court erred. However, Ramos has forfeited this argument.

Thus, the court erred both in denying Ramos's petition without complying with the procedures set forth in section 1172.6 and in its reasoning for doing so.

3. **Because the court did not reach the issue of whether Ramos's petition made a prima facie showing of entitlement to relief, we remand for further proceedings.**

The *Lewis* court determined that the right to counsel under section 1172.6 was created under state law and when an error of state law occurs, the *Watson*[6] harmless error test applies. (*Lewis*, *supra*, 11 Cal.5th at p. 973; see also *People v. Watson, supra*, 46 Cal.2d at p. 836.) Accordingly, where trial courts have denied a petition without appointing counsel, courts of appeal have concluded that any error is harmless where the trial court properly concluded that the record of conviction negates any possibility that the petitioner could obtain relief under section 1172.6. (See *People v. Farfan, supra*, 71 Cal.App.5th at pp. 947, 957 [summary denial of second petition for resentencing without appointing counsel, while erroneous, was harmless where trial court correctly concluded that jury's true finding on felony-murder special circumstance allegation precluded relief as a matter of law]; *People v. Hurtado* (2023) 89 Cal.App.5th 887, 891–893 [trial court's failure to appoint counsel, set a briefing schedule, or hold a hearing was harmless error where the court correctly concluded that the record of conviction demonstrated that the petitioner was "*the* attempted murderer"].)

---

[6] *People v. Watson* (1956) 46 Cal.2d 818.

However, the court's error here was not merely its failure to comply with the procedures set forth in the statute. The court did not conclude, whether on correct or incorrect grounds, that the record of conviction negated the possibility that Ramos could obtain relief under section 1172.6. It expressed no view on whether the petition stated a prima facie showing under section 1172.6. The court stated that it reviewed Ramos's petition, but it is unclear whether the court even considered the record of conviction. The grounds for its denial did not require it to do so: it believed that Ramos's contentions would be, or could have been, addressed on direct appeal, even though this Division had already ruled on the direct appeal, it could not have considered his section 1172.6 arguments on a direct appeal under the law in effect at the time, and the change to the law with respect to attempted murder took effect months *after* that decision.

Under the circumstances, "[i]t is uncertain whether the trial court would have reached the same result using correct legal standards." (*People v. Knoller* (2007) 41 Cal.4th 139, 158 [concluding that the matter should be returned to the trial court to reconsider its new trial order where trial court employed incorrect legal standards]; see also *People v. Reyes* (2023) 14 Cal.5th 981, 992 [where court committed an error of law in sustaining murder conviction, reversing the judgment with directions to remand the matter to the trial court for further proceedings]; *People v. Fuhrman* (1997) 16 Cal.4th 930, 944 ["where the record *affirmatively* discloses that the trial court *misunderstood* the scope of its discretion, remand to the trial court is required to permit that court to impose sentence with full awareness of its discretion"].) Accordingly, we conclude that the best course is to remand the matter for the trial court to comply

with the procedures set forth in section 1172.6, which are summarized above, and to decide whether Ramos can make a prime facie showing of entitlement to relief.[7]

---

[7] For the benefit of the parties and the court below, however, we note that the definition of implied malice in CALCRIM No. 520, with which the jury was instructed, is not the same as the natural and probable consequences doctrine or imputed malice. "Although the instructions related to implied malice and the natural and probable consequences doctrine of aiding and abetting include similar language regarding a 'natural consequence,' they are distinctly different concepts." (*People v. Soto*, *supra*, 51 Cal.App.5th at p. 1056; see also *People v. Mancilla* (2021) 67 Cal.App.5th 854, 867, superseded by statute on another ground.) With implied malice murder the perpetrator knows his conduct endangers another life and acts with conscious disregard of that life. (*Soto*, at p. 1058.) In contrast, under the natural and probable consequences doctrine, an aider and abettor who intends to commit a less serious crime can be convicted of a greater crime that is the natural and probable consequence of the lesser crime. (*Ibid*.) Thus, courts have rejected arguments based on the similarity of language in two materially different theories of murder liability. (See, e.g., *People v. Daniel* (2020) 57 Cal.App.5th 666, 677–678 & fn. 4; *People v. Lee* (2020) 49 Cal.App.5th 254, 263–264.)

## DISPOSITION

The trial court's order is reversed and the matter is remanded to that court for further proceedings consistent with the views expressed in this opinion.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

LAVIN, J.

WE CONCUR:

EDMON, P. J.

EGERTON, J.

16